Thank you. Good morning, and may it please the Court. My name is Dan O'Neill, and I represent Appellant John Costanzo. The government secured a conviction in this case by doing exactly what the Sixth Amendment forbids. It took an out-of-court hearsay statement that Mr. Costanzo's own co-defendant had made in response to a government trial subpoena, and it twisted that into an admission about the core disputed issue at trial, whether there was a quid pro quo. The government's characterization was blatantly false, but the government knew it could get away with that precisely because Mr. Costanzo had no opportunity to cross-examine Mr. Riccio. That was a clear violation of the Confrontation Clause. And to make sure we all know what we're talking about, I urge the Court to look at page 813 of the appendix. That's in volume four. This is the cover sheet that Riccio included with his production, and it describes the documents that follow it as, quote, related to the November 12, 2018, invoice. That's a testimonial statement, and it was made in response to a trial subpoena. Counsel, I read the closing argument where even the government conceded, at one point, misspoke slightly and said Riccio produced these instead of mentioning the corporate entity he was the sole owner of. But where in the trial did the government rely on the cover sheet? Let's leave aside the fact that Mr. Riccio chose to produce the documents that way, and I understand he moved to quash both subpoenas. But leaving that aside, where did the government use that cover sheet as testimonial, and why hasn't that issue been waived? Because there was no objection by either your client or Mr. Riccio when those documents were admitted, the invoice and the production, at least as to the testimonials. Sure. So if I could answer that in three parts. One is we take issue that the government misspoke. I don't think that was a misstatement in the summation. I think that was deliberate. But to answer your first question, Your Honor, page 8, appendix 306, which is page 1046 of the trial transcript, and that's where the government is examining the analyst, Ms. Danko, and they point to the first page, which is the custodial records, and they say, Would you mind just reading who is listed as the custodian? She answers Manuel Riccio. And then they point to the second page, which is the cover sheet. This is on 307 of the appendix. And they say, Can you please read that cover sheet out loud? And she reads the cover sheet and she says, These are documents related to the November 12th invoice. Let's assume, because of time limitations, let's assume that was testimonial for the sake of argument. It came in absent objection. I mean, the time to object would have been when the government sought to introduce that exhibit. How is that not waived, if you could get to that point? Sure. And under this Court's precedents, Hardwick and Riggi and Riho, that's not waiver. That's forfeiture. It would be on the plain error at a minimum, right? We readily concede plain error as to the document. That transaction that the government was alleging was a quid pro quo was not the only one. So let's assume there was some taint with respect to that because of a Bruton Crawford violation. I mean, they have all these other payments that went back and forth. They have 21, your client ran 21 times individuals' names on Natus. So how are you going to be able to prove that, but for that error, the jury, there's a reasonable probability the jury would have come out differently? That's the whole scheme. Two responses, Your Honor. If I may, two responses, Your Honor. One is all the other evidence was completely different. This was all circumstantial evidence. The government failed to prove payments, let alone the- Let me just give you one. I have a feeling you're going to say that. I was looking for one that was also pretty tight like that one was in terms of the timing. On April 11th of 2015, Recchio discusses with your client about the Venezuelans getting arrested. Five days later, the Yankee tickets are given to your – the Yankee game tickets. I know you think that's not necessarily related, but then April 17th, six days after that, there's a payment of $10,000 to JEN. And then less than a week later, your client tells Recchio and Guerra about Group 10 targets. So that's pretty tight in terms of a quid pro quo or not. Why couldn't a jury presume that that 10,000 – infer that that $10,000 was for the information that your client got on April 11th? Because the government never proved that that money actually went to my client, to Mr. Costanzo. It went to JEM, and it sat in JEM's account. Your client's not connected to the JEM account? Is that your – didn't they prove that the client's connected to the JEM account? He had the password because Pagan had texted it to him months before. But he didn't access that money, and he didn't use the JEM account until months later after this payment when the evidence showed that he owed Pagan money for a car payment, or Pagan owed him money for a car payment. But if I could get back to the substantial evidence, the second point, which is to Your Honor's question, how does the court know that there's a reasonable probability that the jury convicted on this basis? It's the government's statements to the jury. The government told the jury this was all they needed. They said this is Resio truthfully admitting that there's a quid pro quo. It told the jury this is all you need to decide the case. It said this resolves the case. This is direct evidence. There was no other direct evidence in the case. And that's – if you follow this – if Mr. Recchio's name had not been on the cover sheet and this had been produced by the company, maybe you think differently, but under the case law, they could still have pointed out that it was produced by a company that Mr. Recchio had control over, right? That wouldn't have been a Crawford problem if they pointed out that the company produced these records. It was because they implicated Recchio himself, right? That would still have been a Crawford problem. It might not have been a Bruton problem by taking out the – because a Crawford problem is any out-of-court statement that's testimonial hearsay. It doesn't – it could be anonymous. It's only – it's a Bruton problem if it's made by the co-defendant. But how could the production of a company of records be testimonial, of the company itself? How could that be testimonial? Under Hubble, it's testimonial, and any act of production can be testimonial if it communicates something about the collection process.  Sure, sure. A corporate entity may or may not have a Fifth Amendment privilege, but it's still testimonial. Hasn't the court found that corporations don't have a Fifth Amendment privilege? And that's a separate issue. That's an issue for my co-appellant. For purposes of Mr. Costanzo and the Sixth Amendment issue, whether there's a Fifth Amendment privilege is irrelevant. But by the time this document was introduced, the jury had already heard evidence about Mr. Recchio's connection to that company in being the sole owner and proprietor of that company, no? Correct, correct. So, again, the jury didn't need his custodial cover sheet to make that connection. But if the government had said nothing about this, other than that these are the records the company produced, the jury could have made these inferences on their own without any argument because Recchio controlled the company, right? Correct, but it would still be a Crawford violation. It would still be a Confrontation Clause violation. It may or may not be a Bruton problem, but it's a Crawford problem. It's an out-of-court testimonial statement, a response to a trial subpoena that the government says is an admission. So the government can't introduce to the jury a production of records by a corporation? They couldn't do that in this case? It can absolutely introduce a production. What it can't do is say this production was made in response to a request for X, and, therefore, this is the corporation. They wouldn't know what the subpoena said. They just have to produce the records alone? They can't make the connection because that connection is testimonial. This is the corporation saying these documents relate to the $2,500 payment. I understand. All right, we'll hear from Mr. Gaynor. Thank you. Thank you. Good morning. May it please this honorable court, my name is Ron Gaynor, and I represent the appellant, Manuel Riccio. I also represented Mr. Riccio in the proceedings below before the district court. Your honors, Mr. Riccio's due process rights to a fair trial were violated for a number of reasons. First, as argued in the appellant's briefs, the government used Riccio's act of production against him in violation of the Bradswell act of production privilege. Government's actions were intentional, as pointed out by co-appellant, and highly prejudicial, and it warrants reversal. Again, I just want to get the standard of review. I think this is also plain error, right? There was no objection to your client's name being on the cover sheet. There was no objection to what the government said in its summation. So isn't this plain error? Your honor, it could be plain error, but because under the Adams case, in the narrow exception of the Fifth Amendment, where there's a compelled testimonial act, Adams, McLaughlin, Ortiz suggests that the Fifth Amendment is self-executing. But how is it compelled when your client chose to provide that custodial statement? He didn't have to. He could have answered the subpoenas by having a custodian appointed, somebody else. He didn't have to attach that cover sheet. He couldn't have had a custodian appointed, because the custodian that would have been appointed in this closely held corporation would have had to have worked with him, talked to him, and gotten him to demonstrate the contents of his mind so that alternative custodian could have complied with the subpoena. And in addition, your honor, respectfully, that subpoena asked for multiple information. And to set up the ability of saying, well, this information was for the November invoice, this information was for other aspects, was important to be able to set that up. But the company, the subject of the subpoena was the company, not your client. Correct, your honor. And when he moved to Quash, the court said, corporation doesn't have a Fifth Amendment privilege. You have to produce. Now, how that production occurs is up to your client, but he did not have to submit a custodial statement. So what I'm taking issue, help me understand how the act of production, had he just produced the documents, no cover letter, or cover letter, company X produces this. How is the fact that he voluntarily chose to do it this way an act of compelling him, particularly when he had moved to Quash the subpoena in the first place? On Fifth Amendment grounds. So, again, as previously stated on the record, there were multiple requests in those subpoenas. So to be able to cut out or carve out what documents would be responsive to what sub aspect of the subpoena, that's why it was done. But your honor, it's not just limited to the cover sheet. It's also part and parcel of what occurred, not just through the questioning of Danko, but also in the government's closing statement and rebuttal in that closing statement. No, and I read those statements, and I think initially the government is referring to the company's production. And there is at one point where the government says RECCIO put these together. And the government concedes that, says, well, that was a, you know, or begins to say it, and then it's a misstatement, says RECCIO, and then says and the name of the company. NGLC, yes. Right. But I guess I'm struggling with the fact that these exhibits came in, the court asking, no objection to the exhibits coming in as full exhibits. If I'm struggling with since this was a concern given the motions to quash, why wasn't there a request to the court? Hey, Judge, we oppose the first page coming in, or we want a redaction of the custodian, and that didn't happen, right? Respectfully, Your Honor, there's a lot of, there's two parts to that question, so if I can answer. Number one, when the court points out that the government kind of misspoke and mentioned RECCIO's name and then mentioned GLC, when you look at that closing statement in context, it was done intentionally where it mentioned RECCIO's name, oh, GLC, and then it went to Costanzo, oh, EBCO. That was very clear. So if there was one mistake, there was two in rapid succession on top. That's why we think it's intentional. In terms of the lack of objection, with respect, with the motion to quash, with the objection to Danko, and with the case law under McLaughton or Tease and Adams suggesting that the Fifth Amendment under this narrow example is self-executing, we believe we were covered, and especially in closing, as a trial lawyer for 39 years, I don't object to closings because I don't know what a judge is going to say. That's not the objection I'm looking at. I'm looking at the objection when the document comes in. Your Honor, we thought we were appropriately covered. At the end of the closing, because you didn't want to potentially be overruled in front of the jury, at the end of the closing, you could have gone up, judge, I can't believe what he just did. He clearly suggested, my client, this was a confession. We want a mistrial. We want a limiting instruction. There's a lot of things that could have been done if, at the end of the summation, I understand you may have been surprised to hear that at that point, but nothing. There was nothing. And if you look at the chain compared to the Sark objections, which was perfectly preserved, which was not a Fifth Amendment claim under self-incrimination, but you look at what occurred in that closing with regard to those statements implicating the Fifth Amendment, we believe, based on the self-executing case law that it was supported by Second Circuit precedent and the Supreme Court under Adams, that we were covered in not objecting. All right. Thank you. All right. We have for the government, Mr. Andrews. Good morning, Your Honors. Matthew Andrews for the government, and I was also counsel of record below. The proper standard for reviewing Recio and Costanzo's unpreserved Fifth and Sixth Amendment objections is plain error, and neither defendant can show that any alleged error was plain, let alone that it affected their substantial rights. Why wasn't, let's just take Mr. Recio for a minute, that Braswell, the Supreme Court has said that there's not a Fifth Amendment problem with a corporation producing documents as long as the individual who produced it is not on the cover sheet. I mean, it could have been more explicit, but that is how it should happen. And here, that didn't happen. His name was on the cover sheet, and the summation highlighted that. Highlighted that it was essentially him testifying because he produced the documents. We can go back and forth about whether that was inadvertent or not. Reading it, it didn't appear to be a correction. I'm sorry I misspoke. It's not Mr. Recio. It's the company. So the district court didn't make any, you know, district courts sit there to hear how it came out, but just from reading it, it doesn't look like to me. It was something that was misspoken. So why isn't that a clear violation of Braswell, plain violation of Braswell? So to be clear, Your Honor, the government in its briefing stated that the admission of this custodian of record form with Recio's signature was likely an error under Braswell. I'm suggesting to you it's a plain error under Braswell. Why is it not a plain error that if they had properly objected, and the district court said no, I'm going to let Mr. Recio's name stay on the cover sheet, I'm going to let the government say that he's testifying about those documents because he produced them. Why wouldn't that have been a plain error under Braswell? And the reason is that Braswell, which was from 1988, addressed the in-court testimony from a custodian from a corporation. Now, there were nine attorneys in the room when the government introduced these records, and the reason that none of those nine attorneys objected is that there is a long line of case law from district courts in this circuit, as well as at least six of his sister circuits, that custodian of records forms are not testimonial. And the reason is that these custodian of records forms really lay a foundation for the introduction of business records, which themselves— If the government says to the jury during the trial that the custodian who produced these is testifying that they relate to each other, isn't that testimonial? So I think there's a couple different components of that, Your Honor. I don't think it is inappropriate for the government to say that the jury can infer from a record that that is whoever has produced the record, admitting that that record is relevant. That is what the parties do all the time when they put records into evidence. The government serves subpoena. Another party produces a response to the subpoena. The government is entitled to say that party produced records in response to the subpoena. That is an admission from the party. That is a characterization, but it doesn't transform the underlying non-testimonial aspect of the documents. I don't agree with that. I think it's clearly—you're suggesting this is a confession by Mr. Recchio, because he produced documents and linked the subpoena request to these text messages that he's admitting to a quid pro quo. There could be nothing more testimonial than the government standing up and saying, him producing these documents is essentially him sitting in a room with a police officer and saying these things relate to each other. How much more testimonial can that get? You're taking the very general situation when someone produces documents. That's not what happened here. And the government, during its rebuttal summation, quickly corrected itself when it said Recchio and then immediately said Global Legal Consulting. However, even if the court— correcting itself would have meant I misspoke. I mean X. Maybe the defense at that point might have thought to raise that issue outside the presence of the jury after the closing arguments were done and sought an instruction or something. But I tend to agree that that statement— I don't think the government characterizes it as it was a misstatement. But maybe because I'm reading the cold transcript. But all it says is Recchio and his company. It doesn't say, excuse me, I misspoke. Right? The government does not say, excuse me, I misspoke. At the same time, there was not an objection. The jury wouldn't take it as something misspoke because Recchio was the company. So they wouldn't have interpreted it as misspeaking. They would have interpreted it the way it came in, which is that he produced the records. So it wasn't inaccurate what was said, the implication the jury would have taken. And that goes, I think— Whatever the intention of the prosecutor was, the jury would have heard it the way it was written. Well, but I think that also goes to the questions raised by Your Honors about how any of this was actually prejudicial. And there's— Before you get to that, I also just want to see whether you agree that there's also a Bruton problem because if, in fact, it is essentially a confession by Recchio that this was like a quid pro quo, they were related to each other, the text messages and the payment, the invoice were related to each other. Why is that not a Bruton problem for Mr. Casanzo? Well, so Bruton involves a statement by a co-defendant that is a confession and that names the co-defendant himself, which that did not occur— The text messages that were attached to the subpoena involved Mr. Casanzo, right? And the closing argument points that out. He's the one who put them together, and what did he provide? Text messages between him and Casanzo. So I think that— It's not like Mr. Casanzo's name is unassociated with this. Some guy he sent text messages to, and that guy is the guy who was on the other end of the quid pro quo. Everybody knows from the text messages the other guy is Casanzo. So if it, in fact, is the equivalent of a confession, it would clearly be a Bruton problem. So the underlying records themselves, the text messages, are not testimonial. The question for Bruton is whether— If you had a confession, a written confession, that says all the things below here, I confess this is what happened, and below there, it implicates the defendant, you have to take it together, right? Somebody's sitting in an interview room with a police officer and signs a confession and admits to certain things with respect to documents. You look at what the documents say. Do they implicate the co-defendant or not, right? Well, Bruton, I think, is actually more specific, Your Honor, in that the testimonial statement actually has to name the defendant, which is the government's point here, which is that— The documents with the admission of the cover sheet, it does name Mr. Casanzo. The text messages name Mr. Casanzo, right? But only if you were to interpret those text messages as testimonial, which they are not. And Bruton always said that the analysis starts at the first step, which is the testimonial statement has to name the co-defendant. And the testimonial statement, which the government does not agree was testimonial, but the defense is arguing is, is that these are records that relate to a certain request. All right. You were going to—I interrupted. You were going to explain why, even if it is error, that it wouldn't affect the outcome of the trial. Yes, Your Honor. And there's three different reasons for that. The first is that Your Honors have pointed out the government's evidence of trial was overwhelming, and Recio's signature on the custodian of record form was two words amongst thousands of pages of documents and testimony. The second reason is to the extent that the global legal consulting returns were relevant, it was not because of Recio's signature, but rather that global legal consulting produced incriminating text messages in response to this, you know. But I thought your harmless argument went to even if—assuming we disagreed with you and found that it was error to allow this document in, which relates to one invoice and payment for—between Recio and Costanzo, what other evidence is—was there admitted that would make this not as critical in terms of why the jury convicted? Yes. That's really the question. Yes. And happy to run through that evidence. The evidence of the $2,500 payment was not solely from the subpoena. In fact, the text records—text messages that were produced by GLC in response to the subpoena had already been seized by the government when the government executed a search warrant on the defendant's phones. So those text messages were already before the jury, and the incriminating invoice from November 12th in which global legal consulting paid a shell company owned by Costanzo's father was also in evidence. So separately and independently from the subpoena returns, the government already had an invoice from November 12th documenting a phony payment and text messages from the next day, November 13th. So this was the government's only evidence of a payment to Mr. Costanzo? No, no. The government had other evidence. I'm simply establishing that the government had an independent source of that evidence. I'm not asking you about this document. I'm asking you about what other evidence of payment to establish the quid pro quo that they claim doesn't exist. Sure. Existed. So there's the $20,000 that were paid to the shell company that was owned by both Costanzo, Racio, and their co-conspirators. Was there where that money went? Mr. O'Neill said that his client got that money. What's your response to that? That was flatly defeated by the record, Your Honor. $3,000 of those payments were used by Costanzo to buy first class plane tickets across the United States. When the bank account was opened, provided Costanzo with the bank account information, I believe with the ATM card and the routing information, so that Costanzo could access that bank account. Costanzo was able to buy those first class plane tickets by himself without any need to do any consultation, because as Eddie Pagan testified when he took the stand, it was a joint company. J stands for John Costanzo. E stands for Eddie Pagan. This goes back to Judge Kahn's question. What other payments besides that one? There are several other payments. There is the $1,000 spent on the Yankees tickets, where Costanzo and another DEA official had their tickets to a Yankees game paid for by Macy. Macy is the corrupt attorney who was behind the scheme. And immediately after those tickets were bought, Costanzo and Raccio discussed how that other DEA agent, who was once at that Yankees game, was about to become the head. You're going to run out of time, so can you get to the payments? I think we're familiar with the facts about the conversation that occurs with the Yankees tickets. What other payments beyond the Yankees tickets? There's the $5,000 payment that's made from Raccio to a contractor who was doing work on Costanzo's house. There was a $50,000 payment that was funneled through Eddie Pagan to Costanzo's father, which was then funneled to Costanzo. That's to buy the money he used to buy the condo? That's correct. Pagan said he was investing in Costanzo's condo. Is that the one? That's the one. And there's also the $20,000 payment that was made to Costanzo's girlfriend from Eddie Pagan after Costanzo's phone had been searched and the case had become known to him to reimburse Costanzo for the legal fees associated with the investigation. And the court doesn't have to just take the dollar amounts themselves. There are recordings, which we have articulated within our brief, in which Raccio and Costanzo and a dirty attorney involved in the scheme talk about how they're going to make money, money, money. So, yes, those are the $90,000-plus in payments that we have specifically alleged and proved at trial. But there are also recordings in which the defendants are discussing the need to make money from this scheme, which is all part and parcel for why any of these alleged errors did not prejudice the defendants whatsoever. On a completely different topic before you sit down, forfeiture. Yes. So forfeiture is in the nature of disgorgement. It's forcing you to give up your ill-gotten gains. And the defendants claim here that the same money was ordered forfeited from both of them when it can't be disgorged from two people. You're not looking like you're so sure that that's the argument. That's my understanding of that. One piece of the forfeiture, their argument is, has been one $20,000 payment has been ordered forfeited from both of them.  And is that, from the government's perspective, that's permissible? Yes. Under Honeycutt, the government is allowed to forfeit the monies even if they have left the defendant's hands. The critical question under Honeycutt is whether the defendant had physical possession or multiple possession.  So I agree that you could have forfeited it from either one of them. My question is, can the government forfeit the same $20,000 from each person through whose hands it passed? That is our understanding of Honeycutt. Because forfeiture is not merely designed to just sort of put the... Forfeiture is not like restitution in which you're trying to put a victim back and to make them whole. Forfeiture is actually a penalty. And in that regard, you can penalize sort of two people for the same payment. Okay. Thank you. All right. We'll get a rebuttal from Mr. O'Neill. Thank you, Your Honors. A few points. Number one, my colleague here was just referencing the payments that Mr. Pagan made, the $50,000 to $20,000. And I think those payments are emblematic of the problem with the government's other evidence in this case, which is the government has no idea where that money came from. There's no proof it came from Resio or either of the attorneys. There was testimony that Mr. Pagan's entire claimed income was $62,000 a year and that he would choose to invest $50,000 in someone else's condo as an explanation for that payment was an argument the jury could have rejected, right? Sure. So why do we get to assess that when the jury heard those arguments and said, you know, made the decision to draw the inference that you didn't want the jury to draw? Because even if the jury discredited Pagan, that still doesn't allow a reasonable inference that this money came from Resio or one of these attorneys. There was no evidence of that. The forensic accountant looked at it and confirmed that this money came from Pagan's account and he never received anything from anyone else. It's just too far a leap. And that's the problem. With respect to the Braswell point, the Bruton point, I think the Braswell issue here, the identification of Resio as the custodian and the summation and the direct testimony of Danko, that leads directly to the Bruton problem. It identifies Resio as the maker of this statement. And it implicated Costanzo because you have to consider the statement about what the document's related to with the documents themselves, which were explicitly from text messages to and from Costanzo. The final point I want to make is that under the plain error standard, this court must consider whether the error, there's a reasonable probability that it affected the verdict and it also must consider the impact on the fairness and integrity of the proceedings. And here the government, this is just a blatant mischaracterization of what this subpoena response was supposed to show. It clearly wasn't about these snippets of messages at the beginning and end. It was about this Delv point issue in the middle. But if it was as bad as you're suggesting to us, it just seems surprising to me that nobody said anything. If it had this overall impact on the fairness of the trial, why wouldn't everybody have been alerted to its significance at the moment? There was a sidebar in the middle of the agent's testimony. That was much more limited though about whether an agent could testify as to what's in the mind of a company. It wasn't really focused on what you're talking about now. I'm talking about the summation. If that summation was as inflammatory in the way it was suggesting a confession, you would think the defense counsel would have been jumping out of their chairs, right? Defense counsel did not. I think they should have. But I think the prosecutor's words are so inflammatory. This is Recio truthfully admitting that there's a quid pro quo. This is all you need to find to convict Costanzo. That's what the government said. Well, they had other evidence of a quid pro quo. They had the recordings. They had them talking about how to get clients. They had them talking about making money, money, money. They had the information of the confidential. I mean, this is a serious case involving too high level a former and then still Costanzo, a current supervisor of the DEA, feeding information about subjects or people who are about to get arrested for drug transactions. I mean, let's put this in the perspective that it is. I can't think of a more egregious type of allegation in terms of the safety of everyone involved. I mean, there's an allegation, a citizen complaint about drug trafficking comes in and that gets turned over. The jury heard this evidence, which is probably, you know, we don't know, but assume the jury heard this evidence and drew the inference that there was a quid pro quo because these monies were passed within days of information about who's on the target list for DEA, who's about to get arrested, who's under investigation for drug trafficking. I mean, it's not as if the jury heard about an investment in a condo in isolation, correct? Correct, and to be clear, we are not disputing that there was information shared and that the information should not have been shared and that that may have had consequences for Costanzo under his policies with the DEA. That's not the issue. The issue is, was that done in exchange for money? You can see there was a lot of money that was given in various ways over time, right? A lot of money given in various ways over time, yes. A lot of money given from- I mean, they're all unrelated. Yes, there was a lot of information going over that shouldn't have gone over, and yes, there was a lot of money being turned over in various ways, but they're completely unrelated. The evidence does not show there's a lot of money from the bribe payers to Costanzo. There's a $284 Yankees ticket, and there's this contractor payment. All right. All right, thanks. Thank you, Your Honors. Mr. Gaynor, you have one minute. Your Honor, to respond to the government, even though the error was plain, we do believe we've given sites in our brief that support the proposition that the application of Fifth Amendment violations should be reviewed de novo, notwithstanding the lack of objection, and that makes sense. Fifth Amendment due process rights, Fifth Amendment right against self-incrimination, those are significant, and if the court, after reviewing Fridman, agrees, then the standard is can the government establish harmlessness beyond a reasonable doubt under the Supreme Court case of Chapman, and the government has the burden of showing the absence of prejudice under Alano. Here, how do they do that when, despite the arguments of my opponent, this was the only direct evidence, the categorization in closing, twice said that this is the only direct evidence of quid pro quo, and the jury need just rely on this? And in terms of some accident happening, I just think we've got to look at the context of that conversation, where Costanzo's name was mentioned also in the context of that direct transaction between Riccio and Costanzo. I think that harmlessness beyond a reasonable doubt is something that the government cannot meet, because there was no direct evidence. You know, in response to the whole Pagan inquiry, Pagan was a real estate investor before giving money to Costanzo. They were best friends. Costanzo was working for, as a best friend, Costanzo for years. So there is an alternative explanation. So in terms of the argument that there was overwhelming evidence, we disagree respectfully. All right, thank you to everyone. We appreciate the arguments. We'll reserve the decision. Have a good day.